**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **CHARLES REED,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 10-1279-STA-egb** |
| | ) | |
| **THE PROCTOR AND GAMBLE** | ) | |
| **MANUFACTURING COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT**

Before the Court is Defendant Proctor and Gamble Manufacturing Company's Motion for

Summary Judgment (D.E. # 41) filed on June 8, 2012. Plaintiff Charles Reed has filed a response

in opposition (D.E. # 44), Defendant has filed a reply (D.E. # 52), and both parties have filed

additional briefs. For the reasons set forth herein, Defendant's Motion is **GRANTED IN PART**.

As more fully explained below, the parties are ordered to file supplemental briefing on Plaintiff's

claim for failure to promote under a mixed motive analysis.

## <u>BACKGROUND</u>

**I. Procedural Background**

To date the parties have filed a number of briefs and exhibits addressing the issues presented

in Defendant's Motion for Summary Judgment. Defendant filed its opening brief on June 8, 2012,

and Plaintiff filed a response in opposition on July 19, 2012. Defendant filed a reply (D.E. # 49) on

August 14, 2012, and then a corrected reply (D.E. # 52) on August 21, 2012. Based on certain arguments raised in Defendant's reply, Plaintiff filed a motion to correct citations in his response brief (D.E. # 53) on August 28, 2012, and on the following day a motion for leave to file a sur-reply (D.E. # 55).

In its order granting in part and denying in part Plaintiff's motion to correct his citations (D.E. # 57), the Court found specific deficiencies in Plaintiff's summary judgment briefing and ordered Plaintiff to file a corrected response to Defendant's statement of undisputed facts.[1] Among other things, the Court directed Plaintiff to "attach all of the evidence on which he relies as the basis for any factual dispute . . . ."[2] The Court also stated that due to the number of defects contained in Plaintiff's briefing, the Court would "disregard Plaintiff's original response to Defendant's statement of undisputed facts (D.E. # 44-2) as well as Plaintiff's summary judgment affidavit (D.E. # 44-4)."[3] On October 26, 2012, Plaintiff filed his corrected response to Defendant's statement of undisputed facts (D.E. # 26), though Plaintiff initially omitted copies of the relevant portions of the transcript of his deposition. Plaintiff then filed on October 28, 2012, a notice of correction (D.E. # 60) along with the missing exhibits (D.E. # 59), acknowledging that counsel had mistakenly left off the transcript from the amended filing. However, Plaintiff had still not attached all of the pages cited from his own deposition.

On November 7, 2012, the Court ordered Plaintiff to show cause as to why counsel should

---

[1] *See* Order Granting in Part, Denying in Part Plaintiff's Motion to Correct Citations, October 12, 2012 (D.E. # 57).

[2] *Id.* at 7.

[3] *Id.*

not be held in contempt for failing to comply with the Court's previous order.[4] Specifically, despite being ordered to put into the record all of the evidence on which he relied to oppose the Rule 56 Motion, counsel for Plaintiff filed a corrected brief and then a second corrected brief but failed to attach all of the relevant pages from Plaintiff's deposition, pages which Plaintiff cited for support in his responses to Defendant's statement of undisputed facts.[5]

Also on November 7, 2012, Plaintiff filed a motion for reconsideration (D.E. # 61), requesting that the Court revisit its previous decision to disregard Plaintiff's summary judgment affidavit (D.E. # 44-2). Plaintiff argued that the exclusion of the affidavit unfairly prejudiced his ability to contest Defendant's statement of undisputed facts and improperly limited Plaintiff only to his deposition testimony. In the alternative, Plaintiff requested that the Court grant him an opportunity to submit another affidavit in a proper form. The Court conducted a hearing on Plaintiff's motion for reconsideration on December 17, 2012. At the hearing the Court addressed the defects it found in Plaintiff's various filings but ultimately granted Plaintiff an opportunity to file an appropriate summary judgment affidavit. Plaintiff filed his amended summary judgment affidavit as well as a second amended response to Defendant's statement of undisputed facts (D.E. # 70) on December 31, 2012. Defendant filed a reply to Plaintiff's second amended response to the statement of undisputed facts (D.E. # 72) on January 14, 2013.

It is well-established that the Court's task at summary judgment is to determine "whether the

_____

[4] Order to Show Cause, Nov. 7, 2012 (D.E. # 62).

[5] Counsel for Plaintiff responded to the show cause order the same day (D.E. # 63) and explained that he had mistakenly believed that his attachments to the corrected brief included the full transcript of Plaintiff's deposition. Counsel attached the full transcript to his show cause response (D.E. # 63-1). The Court accepts counsel's response and considers the matter of his omission resolved.

evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[6] The Court finds that the current record finally allows it to undertake this determination and reach the merits of Defendant's Rule 56 Motion. For clarification, the Court's analysis of the factual record is confined to the following: Defendant's statement of undisputed facts and its supporting exhibits (D.E. # 41-2); Plaintiff's second amended response to Defendant's statement of undisputed facts (D.E. # 70), its supporting exhibits (including Plaintiff's corrected summary judgment affidavit), and any other portion of the record cited by Plaintiff in his second amended response and not previously stricken by the Court; and Defendant's reply to Plaintiff's second amended response to the statement of undisputed facts (D.E. # 72) and its supporting exhibits. Having set out how the parties have briefed the record, the Court now turns to consider what material facts are not in dispute.

## II. Factual Background

The following facts are not in dispute for purposes of summary judgment unless otherwise noted. Plaintiff Charles Reed began his employment with Pringles as a Technician Level 1 ("T1") on April 1, 1996. (Def.'s Statements of Undisputed Facts ¶ 1.)[7] In 1997, Plaintiff received a promotion from T1 to Technician Level 2 ("T2"), and in 2003, Plaintiff progressed from T2 to Technician Level 3 ("T3"). (*Id.* ¶ 3.) Both promotions occurred without any issues or concerns about the promotional process. (*Id.*) At all times relevant to this lawsuit, Plaintiff was working as a T3 lab technician in the Quality Systems Department. (*Id.* ¶ 4.)

---

[6] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

[7] Plaintiff continued to be employed by Defendant until Proctor & Gamble sold the Pringles facility effective June 1, 2012. (Def.'s Statements of Undisputed Facts ¶ 2.) It appears to the Court that Plaintiff continues to work at the Pringles facility under the new ownership.

On March 9, 2009, Plaintiff filed an EEOC charge, alleging race discrimination and retaliation. (*Id.* ¶ 5.) Plaintiff claimed that management denied him certain coaching as well as a promotion to Technician Level 4 ("T4"). (*Id.*) Specifically, Plaintiff claimed that two white employees were provided coaching and support from management for promotion to T4. (*Id.*) Plaintiff further alleged that Defendant retaliated against him by removing him from his extended role in the lab area. (*Id.*)[8] Although Plaintiff failed to specify it in his EEOC charge, Plaintiff alleges in this suit hostile work environment based on email correspondence and a telephone conversation. (*Id.* ¶ 6.)[9]

## A. Plaintiff's Extended Role in the Lab

---

[8] The Court further defines and explains the concept of extended roles for technicians below. Plaintiff adds that prior to filing his EEOC charge in March 2009, he had participated in an internal investigation related to another employee's claim of discrimination. (Pl.'s Resp. to Statement of Fact ¶ 5.) Defendant objects that Plaintiff has not shown when this internal investigation occurred or proven that any of the decision-makers in Plaintiff's case had any knowledge of the investigation. (Def.'s Reply Jan. 14, 2013, 6-7.) Even accepting as true Plaintiff's testimony and affidavit that he participated in a prior investigation, the evidence cited by Plaintiff does not dispute or contradict Defendant's assertion that Plaintiff filed an EEOC charge in March 2009.

[9] Plaintiff elaborates that his hostile work environment claim is also based on several other facts: the use of a noose behind his back on one occasion, racial slurs, exclusion from lunches, diminished interaction with his managers, and a prank where Plaintiff's head and face were splashed with an unknown solution. (Pl.'s Resp. to Statement of Fact ¶ 5.) Defendant responds that the only proof Plaintiff offers for being excluded from lunches and diminished interaction with management is his corrected summary judgment affidavit. Defendant argues that the Court should disregard this evidence because Plaintiff has not specified when these events took place or which employees were involved. Furthermore, the evidence contradicts Plaintiff's deposition testimony where he stated that he had testified to all of the things which formed the basis for his claims and failed to mention these allegations. For the reasons discussed below, the Court finds that the evidence about the treatment Plaintiff received from other employees does not actually support Plaintiff's claims. Therefore, the Court need not resolve the objections Defendant raises here.

Defendant's High Performance Work System ("HPWS") is a non-traditional work design by which all hourly employees called "technicians" are multi-skilled and work on self-directed teams to accomplish the tasks in their respective areas or departments. (*Id.* ¶ 7.) Unlike a traditional job-based work system where each employee has a specific, narrowly-defined job to perform, Defendant's technicians must develop a broad range of skills and knowledge necessary for their department and then apply their training as needed to meet the priorities of their department at any given time. (*Id.*) The HPWS categorizes technicians as T1, T2, T3, T4, and T5. (*Id.*) The HPWS places a high level of individual responsibility on technicians for managing their work, including self-development of a broad range of skills and knowledge and promotion to higher technician levels. (*Id.* ¶ 8.)

The HPWS requires that most technicians rotate to different departments within their facility, utilizing rotation as a productivity tool. (*Id.* ¶ 9.) Some technician positions, however, are ancillary to making, packing, and shipping products and considered "extended roles" because of the nature of the positions. (*Id.*) Technicians placed in an extended role do not rotate to different areas on a standard rotation schedule. (*Id.*) Typically, Defendant has developed extended roles for certain positions which require extended training, special legal or environmental compliance, or contact with highly confidential or personal information. (*Id.*) Even though technicians may work in an extended role for some time, rotation to different departments is essential to the HPWS. (*Id.*) All technicians at Pringles must rotate to different departments unless they have an "extended" or "non-rotational" role. (*Id.*)

When Frank Napadek ("Napadek") became Site Human Resources Manager at the Pringles' facility in the summer of 2008, he learned that the regular rotation schedule, which is integral to the

HPWS, had not been managed closely and that there were thirty-five (35) extended, non-rotational roles at the facility. (*Id.* ¶ 10.) Napadek informed management in the late summer or early fall of 2008 that the Pringles facility was to reduce the number of extended roles. (*Id.*)[10]

In response to Napadek's communication, Jeff Bruns ("Bruns"), Defendant's Site Quality Manager and Plaintiff's direct manager at the time, made the decision to eliminate two of the four extended roles in the lab. (*Id.* ¶ 11.) On or about October 24, 2008, Bruns followed a principle based decision making ("PBDM") model to decide which two of the four technicians in an extended role would remain in an extended role. (*Id.* ¶ 12.) The group making the decision included Bruns, Alan Jackson, Frank Compton, Cindy Kennedy, Gil Newman, and Stuart Massey ("Massey"), Plaintiff's Team Leader at the time. (*Id.*) The decision was based on an evaluation of the business needs of the company and the skills of the individuals in the extended roles. (*Id.*) After analyzing these factors, the group decided that Plaintiff and another technician Renita Cooper would move to rotational roles and that Stella Collier and Delois Kinnie would keep extended roles. (*Id.*) All four of these technicians are African-American. (*Id.*) Bruns and Massey did not recall anyone in the PBDM meeting discussing Plaintiff's complaints about the promotional process. (*Id.*) As a result,

---

[10] Plaintiff counters that Defendant had no "business need" to reduce plant-wide extended roles. (Pl.'s Resp. to Statement of Fact ¶ 10.) According to Plaintiff, Defendant's policy allowed less than five percent (5%) of technicians to work in extended roles, and 35 technicians of the 700 technicians at the Jackson plant were working in extended roles. (*Id.*) In its reply Defendant states that Plaintiff's assertions about business need do not actually contradict the claim that Napadek decided to reduce extended roles for the sake of the HPWS. Furthermore, Defendant argues that Plaintiff cites for support an unauthenticated document which the Court should not consider for purposes of summary judgment. The Court agrees. The interdepartmental correspondence Plaintiff cites appears to be a memorandum dated September 13, 2000 (D.E. # 70-3). However, Plaintiff has not properly authenticated the document to establish its reliability. *Alexander v. CareSource*, 576 F.3d 551, 561 (6th Cir. 2009). For these reasons, the Court finds that there is no genuine dispute as to the issue.

neither Bruns nor Massey considered Plaintiff's concerns in making the decision about which technicians would be placed in the rotational roles. (*Id.*) Napadek played no role in the PBDM process. (*Id.* ¶ 13.)

Plaintiff disputes Defendant's characterization of the PBDM process. As already discussed, Plaintiff contends that Defendant lacked any business need to reduce the number of technicians employed in extended roles. Furthermore, Plaintiff asserts that the outcome of the PBDM process was not based on the employees' relative skills or qualifications. Plaintiff claims that unlike Collier or Kinnie, only he possessed a degree in biology and experience in all three areas of the lab. (Pl.'s Resp. to Statement of Fact ¶ 10.)[11] However, the Court finds that Plaintiff has not disputed the fact that the PBDM process was utilized to select the technicians who would keep extended roles. Plaintiff simply disagrees with Defendant's decision to reduce the number of extended roles and the conclusion reached by the PBDM group.

Following the decision of PBDM group, Plaintiff and Renita Cooper did not immediately rotate out of the lab back to the core operation because their skills were needed in the lab. (Def.'s Statements of Undisputed Facts ¶ 14.)[12] Cooper did not rotate out of the lab until July 6, 2009. (*Id.*) Plaintiff remained in the lab until January 18, 2010. (*Id.*) Bruns, Massey, and Napadek did not select the departments into which Plaintiff and Cooper rotated. (*Id.*) Plaintiff admitted in his deposition that he has no personal knowledge about how the decision was made to rotate him to the hot oil department. (*Id.*)

---

[11] Plaintiff also claims that Bruns and Massey were the two individuals who discriminated against him.

[12] There is an overall technician rotation plan managed by the lab to ensure that technicians possess the skills needed in the lab. (Def.'s Statements of Undisputed Facts ¶ 14.)

## B. Coaching and Promotion to T4

Massey was Plaintiff's team leader in the lab and was responsible for working with technicians to develop their work plans and help them progress as technicians. (*Id.* ¶ 15.) According to Defendant, each technician would make the decision to pursue promotion from T3 to T4. (*Id.*) If a technician wanted to advance, Massey would develop a work plan with the technician during annual performance reviews to meet that goal. (*Id.*)[13] Massey signed off on Plaintiff's work and development plans for 2005 through 2009. (*Id.* ¶ 16.) Plaintiff's work and development plans consistently included T4 status as a goal. (*Id.*) Bruns was the Business Leader of the lab and had the final decision as to whether Plaintiff would move up to T4. (*Id.* ¶ 17.)

In a letter dated October 5, 2008, Plaintiff requested conflict resolution assistance from human resources over the promotional process in the lab. (*Id.* ¶ 18.) Plaintiff admits that before he made his complaint, there was already "talk" that the extended roles had to be reduced. (*Id.*) Napadek was responsible for investigating Plaintiff's request for conflict resolution. (*Id.* ¶ 19.) Napadek met with Plaintiff as part of his investigation. (*Id.* ¶ 20.) According to Defendant, Plaintiff never conveyed to Napadek his belief that his problems in the promotional process had to do with his race. (*Id.*) During the meeting, Plaintiff asked for detailed feedback about how to position himself for promotion from T3 to T4. (*Id.*) Plaintiff admitted during his deposition that his letter did not state that certain technicians received more favorable treatment because they are white. (*Id.*;

---

[13] Plaintiff disputes this description of the promotional process. Plaintiff claims that Massey only developed plans with white technicians and that some white technicians were actually approached about promotions to T4. (Pl.'s Resp. to Statement of Fact ¶ 15.) Plaintiff has cited no evidence in support of his claims other than his own subjective beliefs. Without more Plaintiff has not shown that these facts are truly in dispute. *Adair v. Charter Cnty. of Wayne,* 452 F.3d 482, 491 (6th Cir. 2006) ("Subjective beliefs, without affirmative evidence, are insufficient to establish a claim of retaliation.").

Reed Dep. 181:6-9.)

Plaintiff responds that his October 5, 2008 letter referred to "discrimination" and maintains that the letter raised claims of discrimination based on the more favorable treatment white technicians such as Larry Stout and Katrece Brown received during the promotions process. (Pl.'s Resp. to Statement of Fact ¶ 20.) Plaintiff also asserts that after sending the letter to Kristen King in human resources, he later spoke to King in the hallway and specifically mentioned his belief that the discrimination was based on his race. (*Id.*)[14] Plaintiff goes on to describe his version of the meeting he later attended with King and Napadek about his concerns. Plaintiff specifically states that he told Napadek the discrimination was racially motivated, thereby contradicting Napadek's claim to the contrary. (*Id.*)

In response to Plaintiff's request for conflict resolution, Napadek coordinated a pre-gap T4 requirement meeting with Plaintiff, Bruns, Massey, and Brandy Lenon, which took place on November 6, 2008. (Def.'s Statements of Undisputed Facts ¶ 21.) At the pre-gap T4 meeting, Napadek's goal was to review the T4 requirements and ensure that Plaintiff was provided specific coaching on how to meet those requirements. (*Id.* ¶ 22.) The meeting lasted for approximately two hours. (*Id.*) During the meeting the participants reviewed approximately half of the list of T4

---

[14] Defendant argues that Plaintiff's corrected summary judgment affidavit and deposition testimony conflict on this point. It is true that during the deposition, Plaintiff was asked if he had "any one-on-one meeting" with King, Reed Dep. 141:2-6, and that Plaintiff responded, "I don't recall having a verbal with her *prior* to sending this . . . ." (*Id.* at 141:7-9) (emphasis added). In his summary judgment affidavit, Plaintiff described his informal conversation with King in a hallway some time *after* he sent his October 2008 letter. Reed Decl. ¶¶ 12-13 (D.E. # 70-1). It is not clear to the Court then that Plaintiff's affidavit directly contradicts his previous testimony because Plaintiff's deposition answer specifically referred to a conversation "prior to sending this." In any event, the evidence does not alter the Court's conclusions of law as to Plaintiff's claims.

requirements. (*Id.*) Bruns provided Plaintiff coaching on what steps Plaintiff could take to satisfy the T4 requirements. (*Id.*) Plaintiff responds that the meeting was not a typical pre-gap meeting in that no other technicians were present and his coach Stuart Massey never provided any feedback. (Pl.'s Resp. to Statement of Fact ¶ 22.)

Plaintiff admitted that once he went to Human Resources, action was taken quickly: Napadek set up the pre-gap meeting, the meeting lasted about two hours, and the meeting covered about half of the T4 requirements. (Def.'s Statements of Undisputed Facts ¶ 23.) At the end of the meeting, the group decided that the remaining requirements would have to be reviewed in another meeting. (*Id.* ¶ 24.)[15] On or about November 13, 2008, Napadek met with Plaintiff to follow up on Plaintiff's concerns regarding the promotional process. (*Id.* ¶ 25.) Plaintiff did not report any problems. (*Id.*) Plaintiff responds that he did state to Napadek that he felt as though other employees were treating him differently. (Pl.'s Resp. to Statement of Fact ¶ 25.)[16] Napadek thoroughly investigated Plaintiff's concerns regarding the promotional process and concluded that Plaintiff was not denied coaching or training. ((Def.'s Statements of Undisputed Facts ¶ 26.)[17]

---

[15] Plaintiff adds that he was under the impression that Bruns or Massey would set the follow-up meeting. (Pl.'s Resp. to Statement of Fact ¶ 24.) The Court finds that this fact does not actually dispute Defendant's assertion about the meeting and that Plaintiff's subjective beliefs about the future meeting are not material to the issues presented.

[16] Plaintiff also states that he believed he was receiving this treatment on account of his race. (Pl.'s Resp. to Statement of Fact ¶ 25.) Other than his subjective impression, Plaintiff has not offered any specific evidence in support his belief. *See Adair*, 452 F.3d at 491.

[17] Plaintiff disputes this contention, stating in his corrected summary judgment affidavit that he was "not aware of the claim of race discrimination to Lenon and King ever being addressed. I was never informed that it was addressed." Reed Decl. ¶ 20. The Court finds that this single statement at best shows that Plaintiff has no personal knowledge of the investigation and therefore fails to show that a genuine dispute about Napadek's investigation exists. As for the deposition testimony Plaintiff cites for support, the Court finds that it does not address

At no time after Napadek's investigation did Plaintiff ever approach Napadek to discuss or pursue his T4 requirements further. (*Id.* ¶ 27.) Plaintiff admitted that technicians have a greater responsibility for their own professional development and advancement. (*Id.* ¶ 28.) Plaintiff also admitted that following the pre-gap meeting, he never attempted to have any sort of gap meeting and that he had no reason to update his bullet points on his plant requirements list. (*Id.*)[18]

When Bruns discussed Plaintiff's concerns about the promotional process with human resources, there was no discussion about racial discrimination. (*Id.* ¶ 29.) Plaintiff never complained to Bruns about racial discrimination. (*Id.*) For his part Massey was unaware that Plaintiff had complained about discrimination. (*Id.* ¶ 30.)[19]

_____

Napadek's investigation at all.

[18] Plaintiff reiterates that he was under the impression that Bruns or Massey would set the follow-up meeting. (Pl.'s Resp. to Statement of Fact ¶ 28.) The Court finds that this additional fact does not directly dispute Defendant's contention that Plaintiff himself never initiated another gap meeting.

[19] Plaintiff disputes this fact and cites his deposition testimony where he described conversations he had with Brandy Lenon about his role in the lab and about her conversations with Massey. (Pl.'s Resp. to Statement of Fact ¶ 30.) Defendant objects that this evidence is hearsay and should not be considered at summary judgment. The Court agrees. *See* Fed. R. Civ. P. 56(c)(4) (requiring that an affidavit must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."); *R.K. ex rel. J.K. v. Bd. of Educ. of Scott Cnty., Ky.*, No. 11-5700, 2012 WL 3525403, at *6 (6th Cir. Aug. 16, 2012) ("Affidavits composed of hearsay and opinion evidence do not satisfy Rule 56(e) and must be disregarded.") (quotation omitted)).

Moreover, it is not even clear to the Court that the deposition testimony cited by Plaintiff supports his contention. The testimony concerned Plaintiff's conversations with Lenon about his belief that management was going to remove him from his extended role: "I had gone to Brandy Lenon and told her that I was having trouble getting promoted, that I suspected that my extended role was going to be taken . . . ." (Reed Dep. 129:19-22.) Plaintiff testified that he discussed with Lenon his suspicion that Stuart Massey only wanted white technicians in extended roles. (*Id.* at 130:13-20.) According to Plaintiff, Lenon assured him she would "look into it." (*Id.* at 131:6-10.) Lenon subsequently told him that she had spoken to Massey about Plaintiff; however,

Pursuant to the T4 promotional process in the lab, Massey provided coaching for the process, and Bruns approved the process to become a T4. (*Id.* ¶ 31.) Before the pre-gap meeting in November 2008, Bruns had met with Plaintiff and Massey about six months earlier for the purpose of reviewing Plaintiff's T4 requirements and giving him coaching on what he needed to do to satisfy the requirements. (*Id.* ¶ 32.) Plaintiff denies that this meeting ever took place. (Pl.'s Resp. to Statement of Fact ¶ 32.)

At the time relevant to Plaintiff's claims, the lab had budgeted for and specifically sought two additional T4 technicians. (Def.'s Statements of Undisputed Facts ¶ 33.) As such, there was room for more than one T3 technician to move up to T4 in the lab. (*Id.*)[20] Plaintiff has identified two other T3 technicians like himself who sought to move up to T4 during this time: Katrece Brown and Mike Stout, both of whom are Caucasian. (Pl.'s Resp. to Statement of Fact ¶ 33.) According to Plaintiff,

---

Plaintiff does not describe Lenon's conversations with Massey or in any way show that Lenon discussed claims of racial discrimination with Massey. Therefore, Plaintiff's deposition testimony does not contradict the contention that Massey was unaware of any complaints of racial discrimination made by Plaintiff.

Plaintiff also asserts that Massey had knowledge of his discrimination complaints because Plaintiff accidentally left a copy of his written complaint on a copy machine. Plaintiff cites for support only his EEOC intake questionnaire. (Pl.'s Resp. to Statement of Fact ¶ 30.) Upon review, the Court fails to see how the questionnaire, even if admissible at summary judgment, supports Plaintiff's speculation about his complaint somehow coming into Massey's possession.

[20] Plaintiff disputes this fact, arguing that under company policy Defendant was required to inform Plaintiff that more than one T4 role was available but that Defendant failed to do so. (Pl.'s Resp. to Statement of Fact ¶ 33.) Plaintiff cites for support a document (D.E. # 70-4), which is titled "Jackson Plant Promotion Process Flow Chart." However, Plaintiff has not attempted to authenticate the document or show why it would be admissible as evidence. More importantly, even if the Court considered the exhibit for purposes of summary judgment, the Court finds that the document does not actually show that management was required to notify a technician of the number of positions available. The document simply states at step 2 of the initiation process, "A promotional role is opened and individual applies for role." Therefore, the Court finds Plaintiff's fact contention to be without support.

both Brown and Stout received more favorable treatment from management such as meetings to assess their qualifications for T4. (*Id.*) Like Plaintiff, however, Stout never attained T4 status. (Def.'s Statements of Undisputed Facts ¶ 34.) According to Defendant, Plaintiff and Brown were not competing for a single position because there was room for both to advance to T4. (Def.'s Statements of Undisputed Facts ¶ 33.) Defendant asserts that Plaintiff never met all of the T4 requirements, and Brown did. (*Id.* ¶ 35.) Plaintiff does not deny that he never met all of the T4 requirements. Plaintiff contends that he did meet about 75% of the T4 requirements, which was enough to qualify him for a gap assessment with Bruns and Massey. (Def.'s Statements of Undisputed Facts ¶ 35.) Plaintiff asserts that management repeatedly denied him a gap assessment until he made his complaint to HR about possible discrimination. (*Id.*)

Before the meeting on November 6, 2008, Plaintiff gave Massey an action plan for evaluating his progress towards T4 requirements. (*Id.* ¶ 36.) The plan showed that Plaintiff had not met all of the action items and that Plaintiff described himself as "poor" in some areas. (*Id.*) Plaintiff admitted that he had rated himself as poor versus the plan as to some of the requirements and that he had incomplete items. (*Id.*) During the pre-gap meeting, Plaintiff did not have any of his T4 requirements checked off. (*Id.* ¶ 37.) At the pre-gap meeting, Bruns found that Plaintiff had not satisfied any of the T4 requirements that the group reviewed. (*Id.*) Plaintiff admits that some items on the plan were marked incomplete or poor but adds that he nevertheless possessed 75% of his plant requirements. (Pl.'s Resp. to Statement of Fact ¶ 37.) At no point when Massey was in the lab as the team leader did he feel that Plaintiff should advance to T4 because Plaintiff did not meet enough

of the T4 requirements.  (Def.'s Statements of Undisputed Facts ¶ 38.)[21]

## C.  Hostile Work Environment

Plaintiff admitted that when he approached Bruns about allegedly hostile email correspondence from Massey, his complaint was based on one email chain and that Plaintiff no longer possessed the emails.  (*Id.* ¶ 39.)  Plaintiff adds that he actually printed the emails and turned them over Bruns.  (Pl.'s Resp. to Statement of Fact ¶ 39.)[22]  According to Defendant, Plaintiff also admitted that the telephone call he complained about was a single call from Massey related to his request for vacation time, which he was ultimately given.  (Def.'s Statements of Undisputed Facts

---

[21] Plaintiff disputes this fact but fails to offer any evidentiary support for his position. Plaintiff contends that Massey developed a coach's summary for Plaintiff, which noted "only a couple of issues" with Plaintiff's promotion to T4.  (Pl.'s Resp. to Statement of Fact ¶ 39.) According to Plaintiff, Massey's concerns had no basis in fact.  (*Id.*)  However, Plaintiff has not produced the summary, and the Court is left to speculate about what issues it documented.

Plaintiff has also cited his deposition testimony for support, specifically his testimony about his conversations with Brandy Lenon.  The Court has already held that this testimony is inadmissible hearsay.  Furthermore, even accepting the testimony for the truth of the matters asserted, it is not clear that the evidence supports Plaintiff's assertion that "Massey wanted Reed to be the leader in the Fat and Moisture System, but the fact is that Reed was the leader in this system."  (Pl.'s Resp. to Statement of Fact ¶ 38.)  Plaintiff simply testified that Massey told Lenon that Plaintiff needed to become more "visible" as the owner of the fat and moisture system.  (Reed Dep. 132:11-18.)  And Plaintiff felt that Massey's suggestion was "ridiculous." (*Id.* at 132:18-20.)  In sum, Plaintiff has again relied only on his own belief that Massey's opinion had no basis in fact.

[22] The Court notes that Plaintiff attached to his initial summary judgment affidavit a copy of an email dated July 31, 2009, from Massey to Plaintiff (D.E. # 44-4).  The first sentence in the email states, "I was trying to give you a pat on the back and you turn it all around.  If you want to continue to play this game I will accomodate [sic] or you can cut the crap now."  Even though the Court struck the affidavit and its attachments and directed Plaintiff to "attach all of the evidence on which he relies as the basis for any factual dispute" to a corrected affidavit, Plaintiff failed to file the email with his corrected briefing.  Furthermore, Defendant objects that Plaintiff never produced the email in discovery and should not be allowed to rely on it at summary judgment. Even taking the email into account, the Court finds that it does not alter the Court's legal conclusions about Plaintiff's claims.

¶ 39.)  Plaintiff also admitted that when he talked to Bruns about Massey's allegedly hostile behavior, Plaintiff never expressed why he thought Massey was harassing him or why he found the environment hostile.  (*Id.* ¶ 40.)[23]

While Plaintiff complained that Brown received training on fatty acids, Plaintiff admitted that Frank Compton, an African American male, also received training on fatty acids.  (*Id.* ¶ 41.) While Plaintiff complained that he was not allowed to travel to receive training, Plaintiff admitted that Compton was the individual sent on the next training trip.  (*Id.* ¶ 42.)  Plaintiff also admitted that management reassigned the task of analytical guru from Plaintiff to Compton.  (*Id.* ¶ 43.)[24]

Defendant has asserted additional statements of undisputed fact in support of its Motion for Summary Judgment.  Defendant has asserted that Plaintiff failed to mitigate his damages.[25]  The Court need not consider this fact issue at this time because the Court is granting Defendant's Motion for Summary Judgment on nearly all of Plaintiff's claims and need not address the issue of damages at this time.

### III.  The Parties' Arguments

Defendant seeks judgment as a matter of law on all of Plaintiff's claims of discrimination.

---

[23] Plaintiff disputes this assertion and states that he "has maintained that the hostile work environment was retaliatory due to his race discrimination claims." (Pl.'s Resp. to Statement of Fact ¶ 40.)  The evidence Plaintiff cites, however, only shows that Plaintiff has maintained this theory in this lawsuit.  The Court finds that Plaintiff has not actually shown that a genuine dispute exists as to Defendant's claim that Plaintiff never told Bruns that he thought Massey was retaliating against him for Plaintiff's complaints of race discrimination.

[24] Plaintiff believes that Compton received favorable treatment "in order to cover the discrimination" directed at Plaintiff. (Pl.'s Resp. to Statement of Fact ¶ 41.)  Other than his own subjective belief, Plaintiff has cited no proof for this contention.   The Court finds it unnecessary to address this evidence further because Plaintiff has not cited it to support any of his claims.

[25] Def.'s Statement of Undisputed Facts ¶ 44.

First, Defendant argues that Plaintiff cannot prove his race discrimination claim because he cannot show that non-protected employees were treated more favorably. Plaintiff has not adduced admissible evidence that other employees received more coaching in support of their promotional process. Defendant contends that Plaintiff has likewise failed to prove a failure to promote. The undisputed evidence shows that Plaintiff was not competing against his alleged comparators for a single job but for advancement to an employment level. In other words, Plaintiff had the opportunity to receive the promotion even if his comparator also moved up to T4. According to Defendant, Plaintiff simply lacked all of the qualifications for T4 status. With respect to Defendant's retaliation claim, Plaintiff has failed to prove that he complained of discrimination on the basis of his race or that the decision makers in his case had any knowledge of his protected activity. Plaintiff also cannot establish that he suffered an adverse employment action based on other hostile behavior in the workplace or the elimination of his extended role. To the extent that Plaintiff has even alleged a stand-alone claim of hostile work environment, Plaintiff has only a single chain of emails and a single telephone call to support the theory. Finally, even if Plaintiff could make out any claim for discrimination, Defendant contends that Plaintiff cannot prove that Defendant's legitimate, nondiscriminatory reasons for its actions were pretext. Therefore, Defendant argues that summary judgment is appropriate.[26]

Plaintiff has responded in opposition and argues that genuine issues of material fact remain

_____

[26] Defendant has made an alternative argument that Plaintiff failed to mitigate his damages. Defendant has cited evidence in support of this contention. (*See* Def.'s Statement of Undisputed Facts ¶¶ 44-46.) The Court declines to reach the issue of damages at this time. Not only is the Court granting Defendant judgment as a matter of law on most of Plaintiff's claims, the Court is also directing the parties to file supplemental briefs on the remaining claim, including what remedies Plaintiff can recover should his final claim go to a jury and the jury find in Plaintiff's favor.

for trial. Plaintiff initially argues that direct evidence of discrimination exists in this case and cites the following facts for support: an employee allegedly putting a noose behind Plaintiff's back at work, racial slurs, exclusion from lunches, decreased interaction with managers and co-workers, and a prank where another employee splashed a liquid in Plaintiff's face. Plaintiff also cites testimony from Reginald Charles, another employee of Pringles, who overheard racist comments in the workplace and observed management pass over qualified African-American employees for promotion.[27] Plaintiff contends that each of these facts constitutes direct evidence of race discrimination.

As for the merits, Plaintiff contends that the proper analysis for his claims is the Sixth Circuit's mixed motive standard, meaning Plaintiff need only show that he suffered an adverse employment action and that race was a motivating factor. Plaintiff contends that he was denied promotion to T4 as well as coaching opportunities to support his bid for promotion. As for evidence of race as a motivating factor, Plaintiff relies on the same evidence he cites as a direct evidence of discrimination in this case, that is, various incidents which according to Plaintiff show racial animus.

In the alternative, Plaintiff states that he can satisfy the *McDonnell Douglas* burden-shifting test to show discrimination. Plaintiff's response brief is not clear on this point. Plaintiff first lists the *prima facie* case for a disparate treatment claim but then goes on to argue that he can adduce evidence to support each element of a failure to promote claim. Plaintiff further argues he can show Defendant's proffered reason for not promoting Plaintiff, that he did not meet all of the qualifications for T4, had no basis in fact. Plaintiff cites for support declarations from co-workers, both of whom

---

[27] Plaintiff bases his claim of hostile work environment on this same evidence as well as the evidence discussed below about Plaintiff's repeated complaints to management. (Pl.'s Resp. in Opp'n 16-17, D.E. # 44-1.)

state their belief that Plaintiff was qualified for T4 status.[28]  As for the training or coaching opportunities Plaintiff was denied, Plaintiff asserts that the denial was materially adverse.  Plaintiff argues that the coaching provided for Katrece Brown allowed her to advance to T4 and that despite his requests for similar coaching, Defendant never provided it.[29]

With respect to this claim for retaliation, Plaintiff contends that he engaged in protected activity by making complaints of discrimination to Kristen King and Frank Napadek in human resources and to Brandy Lenon.[30]  Plaintiff argues that the elimination of his extended role in the lab and transfer to another job in the facility was an adverse action in retaliation for these complaints. Plaintiff asserts that Defendant's reasons for reassigning him had no basis in fact and thus were pretext for the retaliation.[31]  Plaintiff also claims that Jeff Bruns retaliated against him when Plaintiff complained about a threatening email and a hostile telephone call from Stuart Massey, specifically

---

[28] Kinnie Decl. ¶ 7 (D.E. # 44-6); Collier Decl. ¶ 7 (D.E. # 44-7).

[29] Plaintiff also states in his response brief that Larry Stout received the additional coaching and was ultimately promoted.  (Pl.'s Resp. in Opp'n 13.)  However, there is no evidence showing that Stout was promoted.  In fact, Plaintiff has admitted in his second amended response to Defendant's statement of undisputed facts that Stout was not promoted and is still a T3.  (*See* Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶ 34.)  Plaintiff has not accounted for this contradiction.

[30] While Plaintiff has adduced evidence that he told Lenon about his suspicions of discrimination, Plaintiff's brief refers to other information that is not actually part of the record before the Court.  For example, Plaintiff argues that Lenon had a duty under Defendant's "World Wide Business Conduct Manual" to report his complaint of discrimination but failed to do so. (Pl.'s Resp. in Opp'n 14.)  Plaintiff has not put the manual into the record.  The only evidentiary support cited is Plaintiff's initial summary judgment affidavit, which the Court has stricken. Under the circumstances Plaintiff has not provided any evidence to support this contention.

[31] Plaintiff also refers in passing to his belief that Frank Compton, a co-worker in the lab, was retaliating against him.  (Pl.s' Resp. in Opp'n 15.)  Plaintiff has not shown what form the retaliation took or how a co-worker (and not a manager) had an opportunity to subject him to an adverse action.  As such, the Court declines to consider this isolated statement further.

that Bruns told Plaintiff that Bruns would be taking away some of the freedoms lab technicians had enjoyed.[32]  Therefore, Plaintiff argues that triable issues remain on each of his theories.

In its reply brief, Defendant argues that Plaintiff has not satisfied his burden to survive summary judgment.  Defendant challenges Plaintiff's claim that he has adduced direct evidence of race discrimination.  All of the evidence which Plaintiff describes as direct evidence actually requires the finder of fact to make an inference or assumption.  As a result, the evidence cannot constitute direct evidence of discrimination.  With respect to the alleged incident with the noose, Plaintiff admits that he never saw a noose but only formed a belief about what had occurred behind his back.  Plaintiff has also failed to provide any evidence of racial slurs being used.  At best isolated comments referring to "fried chicken" or "watermelon" are ambiguous.  The affidavit of Reginald Charles also fails to offer only hearsay, speculation, or conclusory statements.  Defendant maintains then that none of these facts can be direct evidence of discrimination.

As for the correct analysis for Plaintiff's claims, Defendant asserts that Plaintiff has only come forward with indirect evidence of discrimination and therefore must rely on the *McDonnell Douglas* framework, not a mixed motive analysis.  Defendant argues that Plaintiff has failed to meet his initial burden to establish a *prima facie* case of failure to promote.  Specifically, Plaintiff has not shown that he was qualified for promotion to T4.  According to Defendant,

> Plaintiff provides, at best conflicting evidence. In one breath, in support of his denial of training claim, Plaintiff maintains he was not able to obtain skills to be promoted because he was denied training, and in the next breath, Plaintiff contends, in support of his failure

---

[32] Plaintiff does not specify what these freedoms were, though in his deposition he mentioned longer lunch breaks and choice in selecting time off from work.  (Reed Dep. 167:2-15.)

to promote claim, he was qualified for the promotion.[33]

Furthermore, Plaintiff cannot rely on the subjective beliefs of co-workers to establish his qualifications for the promotion. Plaintiff has failed to show that his alleged comparator Katrece Brown did not possess all of the qualifications, much less demonstrate that he had similar or better qualifications than Brown. At best Plaintiff has only shown that he met 75% of the T4 requirements and that none of the requirements were "checked off" during the November 2008 pre-gap meeting. Defendant argues then that Plaintiff cannot prove his claim for failure to promote.

Defendant next argues that Plaintiff has also failed to make out any claim based on his failure to receive training or coaching. Just as with the failure to promote claim, Defendant argues that Plaintiff is arguing that he was qualified for promotion but at the same time claiming that he did not receive the training necessary to qualify for promotion. Defendant further argues that Plaintiff has not proven how Katrece Brown received more favorable treatment. Plaintiff has no evidence to show with particularity what additional training or support Brown actually received.

Concerning Plaintiff's remaining claims, Defendant counters that Plaintiff's retaliation claim fails. Plaintiff has not shown that Bruns or Massey, the alleged decision-makers, had any knowledge of Plaintiff's prior protected activity. Plaintiff has otherwise failed to establish a causal connection between the alleged adverse action and Plaintiff's protected complaints. Plaintiff also cannot show that Defendant's legitimate reasons for reducing the number of extended roles in the facility had no basis in fact or was pretextual. Defendant relies for additional support on the business judgment rule. Defendant finally contends that Plaintiff has offered no proof to support his hostile work environment claim. Plaintiff has not proven when the incidents to which he refers occurred or who

---

[33] Def.'s Corrected Reply 15 (D.E. # 52).

was involved or that they were directed at him on the basis of his race. Instead Defendant characterizes the episodes as nothing more than teasing, offhand comments, or isolated incidents that did not alter the terms and conditions of Plaintiff's employment. For all of these reasons then, Defendant argues that the Court should grant Defendant judgment as a matter of law on all claims.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving part "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[34] In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.[35] When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[36] It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[37] These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[38] When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or

---

[34] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

[35] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[36] *Celotex*, 477 U.S. at 324.

[37] *Matsushita*, 475 U.S. at 586.

[38] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

whether it is so one-side that one party must prevail as a matter of law."[39]

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[40] In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [her] asserted causes of action."[41] Finally, the "judge may not make credibility determinations or weigh the evidence."[42] Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[43]

## ANALYSIS

For the reasons that follow, the Court holds that Defendant is entitled to judgment as a matter of law on Plaintiff's claims of single-motive race discrimination, retaliation, and hostile work environment as well as Plaintiff's claim for mixed-motive failure to train. Plaintiff has alleged his claims under Title VII as well as pursuant to the Tennessee Human Rights Acts ("THRA"). Title VII states that it is an "unlawful employment practice for an employer . . . to discriminate against any individual . . . because of [his] race, color, religion, sex, or national origin."[44] Courts evaluate claims

---

[39] *Id.* at 251-52.

[40] *Celotex*, 477 U.S. at 322.

[41] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[42] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

[43] Fed. R. Civ. P. 56(a); *see also Celotex*, 477 U.S. at 322.

[44] 42 U.S.C. § 2000e–2(a)(1).

of discrimination brought under the THRA under the same analytical framework and federal case law that apply to claims brought pursuant to Title VII.[45] Thus, the Court's "analysis and conclusions concerning the Title VII claims apply equally to parallel claims brought under THRA."[46] The Court will consider each of Plaintiff's separate theories in turn.

## I. Direct Evidence

Plaintiff first argues that he has adduced the following direct evidence in support of his claims: an alleged incident involving a noose, the use of racial euphemisms in the workplace, other technicians excluding Plaintiff from lunch breaks, a decrease in management's interaction with Plaintiff, a prank where an unidentified co-worker splashed a liquid in Plaintiff's face, and other acts of discrimination described in the declaration of Reginald Charles. "[A] plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment."[47] "Direct evidence proves the existence of a fact without requiring any inferences."[48] "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."[49]

---

[45] *Jackson v. Bd. of Educ. of Memphis City Sch. of Memphis, Tenn.*, No. 10-5937, 2012 WL 3326305, at *4 n.1 (6th Cir. Aug. 14, 2012) (citation omitted); Tenn. Code Ann. § 4-21-311(e) (codifying *McDonnell Douglas* burden shifting framework in THRA cases).

[46] *Jackson*, 2012 WL 3326305, at *4 n.1.

[47] *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003).

[48] *Hale v. ABF Freight Sys., Inc.*, No. 11-6440, 2012 WL 5259156, at *6 (6th Cir. Oct. 25, 2012) (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004) (ellipsis omitted).

[49] *Id.*; *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).

Applying these standards to the evidence presented here, the Court holds that Plaintiff has not adduced direct evidence of discrimination. Plaintiff has merely shown that some co-workers made possibly stereotypical remarks, played pranks, or decided not to have lunch or interact with Plaintiff in other ways. Even viewing this evidence in the light most favorable to Plaintiff, stray remarks or ambiguous acts of third parties who have no part in the decision-making process generally do not constitute direct evidence of discrimination.[50] As such, this evidence cannot be direct evidence of discrimination as a matter of law.

The only evidence of an incident involving an individual with management authority is Plaintiff's claim that Stuart Massey displayed a noose behind his back as Plaintiff spoke with another co-worker. During his deposition, Plaintiff testified that he was working at his desk and speaking with Kim Newman, another technician, when Plaintiff observed Massey remove a telephone cord from a drawer in another desk.[51] At some point after Massey was no longer in Plaintiff's field of vision, Newman laughed and said to Massey "Are you about to hang someone?"[52] Before Plaintiff could turn to see Massey, Plaintiff heard the sound of the cord falling into a trash can.[53] At his deposition Plaintiff testified as follows: "And my immediate reaction was that possibly a noose had been formed out of the cord or some type of gesture to indicate something that I felt was extremely

---

[50] *Carter v. Univ. of Toledo,* 349 F.3d 269, 273 (6th Cir.2003) ("[C]omments made by individuals who are not involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination.").

[51] Reed Dep. 252:4-12.

[52] *Id.* at 252:16-18.

[53] *Id.* at 252:18-20.

offensive."[54]  Plaintiff went on to admit that he never saw the cord in the shape of a noose.[55]

Courts have long recognized that nooses are "pregnant with historical and cultural meaning" and that the presence of a noose in the workplace may constitute evidence of racial discrimination.[56] The evidence in this case presents a very close call, largely because there is no testimony in the record before the Court showing that a noose was actually displayed.  Plaintiff admittedly has no personal knowledge that Massey had fashioned the telephone cord into a noose,[57] and Plaintiff's allegation is supported only by his own "mere speculation" or "conjecture."[58]  At the same time, Plaintiff has his account of Massey taking the extension cord out of the drawer as well as the subsequent remark made by Newman referring to Massey hanging someone.[59]  Viewing the facts in

---

[54] *Id.* at 252:20-24.

[55] *Id.* at 253:1-7.

[56] *Curry v. SBC Communications, Inc.*, 669 F. Supp. 2d 805, 834-35 (E.D. Mich. 2009) (collecting cases); *Davis v. Omni-Care, Inc.*, 482 F. App'x 102, 103 (6th Cir. 2012) (analyzing an employee's claim of retaliation based in part on his complaints about a noose displayed in the workplace); *Hall v. City of Clarksville*, 276 F. App'x 457, 464 (6th Cir. 2008) (holding that jury verdict in favor of the plaintiff on his claim of hostile work environment was supported in part by evidence of a noose hanging in the workplace); *E.E.O.C. v. Nw. Airlines, Inc.*, 188 F.3d 695, 702 (6th Cir. 1999) (concluding that the presence of a noose in the workplace constituted discriminatory conduct); *E.E.O.C. v. L.A. Pipeline Constr., Inc.*, 2:08-CV-840, 2010 WL 2301292, at *8 (S.D. Ohio June 8, 2010) (referring to "the extreme forms of racial prejudice associated with nooses").  The Court notes that in these cases, there was no dispute that a noose was displayed in the workplace and actually seen by a protected employee.

[57] Fed. R. Evid. 602 ("A witness may to testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

[58] *Clemente v. Vaslo*, 679 F.3d 482, 495 (6th Cir. 2012) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

[59] Newman's comment appears to be a present sense impression that would survive the rule against hearsay.  *See* Fed. R. Evid. 803(1) ("A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it" is "not excluded by the

the light most favorable to Plaintiff, a reasonable juror could credit his testimony and find that Massey did something behind Plaintiff's back, perhaps suggestive of hanging or doing harm to Plaintiff. However, the fact remains that the evidence is ambiguous and would compel a reasonable juror to draw one or more inferences from the testimony to conclude that it was probative of Massey's discriminatory intent.[60] Therefore, the Court concludes that proof of the alleged noose incident does not constitute direct evidence of Massey's racial bias or animus.

Finally, Plaintiff relies on the affidavit of another Pringles employee Reginald Charles as direct evidence of discrimination in this case. According to Charles, Defendant promoted less qualified Caucasian employees over African American employees at Pringles; unidentified individuals in leadership positions at Pringles used racial slurs in the workplace; and other unidentified employees who made derogatory statements about African-Americans received promotions to leadership positions.[61] The Court holds that Charles's declaration does not constitute direct evidence of discrimination against Plaintiff. First, while it is true that evidence of a racially discriminatory atmosphere may be relevant, such evidence constitutes only circumstantial evidence, and not direct evidence of discrimination.[62] Second, Charles has not provided any specifics regarding the claims he asserts in the declarations such as the identity of the persons to whom he

---

rule against hearsay, regardless of whether the declarant is available as a witness . . . .").

[60] *White v. Columbus Metro. Hous. Auth.,* 429 F.3d 232, 239 (6th Cir. 2005) ("Isolated and ambiguous comments are insufficient to support a finding of direct discrimination.").

[61] Charles Decl. ¶¶ 8, 10, 11 (D.E. # 44-5).

[62] *Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012) ("The fact that the statements do not specifically mention Daugherty means only that they are not direct evidence of discrimination; they could still be circumstantial evidence of discrimination.") (citation omitted).

refers or the timing and circumstances of the incidents he mentions. Without these details, the Court

is poorly situated to engage in a fact-bound determination of whether the "other acts" evidence is

even relevant to Plaintiff's claims.[63] None of Charles's assertions relate to Plaintiff, and Charles

actually admits that he has never worked directly with Plaintiff. The Court finds then that the

declaration is too conclusory to be admissible as evidence of discrimination at all, much less direct

evidence of discrimination against Plaintiff. Therefore, the Court concludes that Plaintiff has not

shown that direct evidence of unlawful discrimination exists in this case.

## II. Race Discrimination

Having determined that Plaintiff's case is based on circumstantial evidence only, the Court

now considers the merits of his claims of race discrimination. Plaintiff alleges that Defendant

discriminated against him on the basis of his race (1) by failing to provide the same coaching

opportunities to him that were offered to similarly situated non-protected employees and (2) by

denying him a promotion from T3 to T4. Plaintiff argues for the first time at summary judgment that

he can establish these claims under a mixed motive analysis as well as the *McDonnell Douglas*

burden shifting framework. The Court will address the mixed motive issue at the conclusion of this

Order.

Both parties agree that to the extent that Plaintiff bases his claims on circumstantial evidence,

the *McDonnell Douglas* burden-shifting framework also applies.[64] "Circumstantial evidence . . .

---

[63] *Id.* at 598 ("Whether [other acts] evidence is relevant is a case-by-case determination that depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case.") (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 380–81, 387 (2008) (internal quotation marks omitted).

[64] *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 347 (6th Cir. 2012).

is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred."[65]  "Under the *McDonnell Douglas* burden-shifting framework, once a plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual."[66] The Sixth Circuit has explained that "the requirements for establishing a *prima facie* case of discrimination are context-dependent."[67] And yet "[t]he key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination."[68]  Plaintiff bases his claims of race discrimination on Defendant's failure to provide training or coaching during the promotions process and the failure to promote him to T4 status.[69]

## A. Failure to Train

In order to make out a *prima facie* case of discrimination based on a failure to train, Plaintiff must prove that (1) he is a member of a protected class; (2) he suffered an adverse employment

---

[65] *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).

[66] *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).

[67] *Ford v. Securitas Sec. Servs. USA, Inc.*, 338 F. App'x 483, 486 (6th Cir. 2009).

[68] *Baldwin v. Wright Patterson Air Force Base*, 463 F. App'x 487, 490 (6th Cir. 2012) (quotation omitted).

[69] The Court limits its analysis to these two allegations of disparate treatment and declines to reach other possible theories, which Plaintiff has not actually alleged in this case or briefed at summary judgment.

action; (3) he was qualified for the position; and (4) a person outside the protected class was treated more favorably than he was.[70] The Court holds that Plaintiff has failed to establish the elements of his claim for failure to train or coach. Plaintiff has not shown that Defendant took an adverse employment action against him by denying him coaching and pre-gap meetings in support of the promotional process. An adverse employment action is "a materially adverse change in the terms and conditions of [a plaintiff's] employment."[71] For example, an adverse employment action usually results in a "significant change in employment status," such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[72] On the other hand, a "bruised ego" or a "mere inconvenience or an alteration of job responsibilities" do not amount to adverse employment actions.[73]

The Sixth Circuit has held that a "deprivation of increased compensation as the result of a failure to train constitutes an adverse employment action."[74] In *Clay*, a driver was assured at the time of his hire that he would receive training to drive triple-trailer, semi-trucks for long haul deliveries.[75]

---

[70] *Clay v. UPS*, 501 F.3d 695, 703 (6th Cir. 2007) (quotation omitted) (applying these factors to a disparate treatment claim based on a failure to train).

[71] *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010) (quotation omitted).

[72] *Id.* (citation omitted).

[73] *Id.* (citation omitted).

[74] *Clay*, 501 F.3d at 710. *But see Darby v. U.S. Dep't of Energy*, No. 05-4325, 2006 U.S. App. LEXIS 32556, at *15 (6th Cir. June 8, 2006) ("Her allegations are insufficient to make a prima facie showing of discrimination because the failure to provide training or to attend seminars is not an adverse employment action.").

[75] *Clay*, 501 F.3d at 709.

Drivers who drove "triples" made an extra $1 per hour.[76]  The plaintiff in *Clay* had only to sign up

for the training and then complete a "triples" run with another driver in order to qualify for "triples"

of his own and the additional pay.[77]  When the plaintiff was next in line on the sign-up sheet for

training, his supervisor suspended the training until further notice and without any explanation for

the delay.[78]  The Sixth Circuit held that even though the plaintiff in *Clay* ultimately received the

training, the denial of the training and the resulting delay in increased pay for driving "triples" was

an adverse employment action.[79]

By contrast, Plaintiff in the case at bar has not shown that the lack of coaching caused him

to be "passed up for promotions."[80]  Viewing the evidence in the light most favorable to Plaintiff,

other non-protected employees, Katrece Brown and Mike Stout, received meetings of some kind to

discuss their qualifications for promotion to T4.[81]  Management did not grant Plaintiff such a pre-

gap assessment until November 2008 after Plaintiff had made a complaint to human resources about

Brown and Stout receiving additional coaching.  A reasonable juror could infer from this proof that

Plaintiff's coaching was delayed and that non-protected employees received more favorable

---

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.* at 710.

[80] *See Vaughn v. Louisville Water Co.*, 302 F. App'x 337, 345 (6th Cir. 2008) (distinguishing *Clay* where the plaintiff "failed to present any evidence that she was passed up for promotions because of her inability to attend" certain training).

[81] Plaintiff also complained that management had singled out another employee Delois Kinnie, who is African-American, for possible promotion to T4.  The Court discusses this evidence more fully in its analysis of Plaintiff's retaliation claim.

treatment than Plaintiff.

However, even if Plaintiff should have received a pre-gap meeting sooner, he has not proven that the delay adversely affected his employment status or his ability to advance to the higher pay grade. The undisputed evidence shows that when Plaintiff was granted the meeting in November 2008, Plaintiff had not completed all of his T4 requirements. In fact, Jeffrey Bruns testified that Plaintiff had not satisfied any of the T4 requirements the group reviewed during the meeting. It follows that Plaintiff lacked the qualifications for the promotion to T4 at all times before the pre-gap meeting, and as far as the Court can tell, Plaintiff continues to work at Pringles as a T3 to this day. Unlike the plaintiff in *Clay*, Plaintiff's delay in receiving a pre-gap meeting did not delay Plaintiff's promotion and higher pay grade.[82] Therefore, the Court holds that under these facts Plaintiff's delay in receiving a pre-gap assessment was not an adverse employment action. Although Plaintiff places great importance on the pre-gap meeting in the promotions process,[83] he has failed to make out a *prima facie* claim of discrimination for failure to train. Therefore, Defendant's Motion is **GRANTED** as to this claim.

**B. Failure to Promote**

In order to make out a *prima facie* case of discrimination based on a failure to promote, Plaintiff must prove that (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion; (3) he was considered for and was denied the promotion; and (4) an individual of

---

[82] The record also tends to show that the pre-gap meeting did not ensure promotion. Mike Stout, a non-protected T3 employee, had a pre-gap meeting but like Plaintiff never advanced to T4.

[83] *Vaughn*, 302 F. App'x at 345 ("But [a plaintiff's] own conclusory assertions as to the value of the training and [his] inability to receive promotions are insufficient to survive summary judgment.") (citation omitted).

similar qualifications who was not a member of the protected class received the job at the time Plaintiff's request for the promotion was denied.[84]   The Court holds that Plaintiff has failed to establish all of these elements.   Specifically, Plaintiff has not come forward with proof that he was qualified for promotion.   In fact, it is undisputed that Plaintiff never developed or achieved all of the qualifications for advancement to T4.   Plaintiff asserts that he had met over 75% of the requirements for T4, which was enough to trigger a gap assessment.   Even accepting this assertion as true, the undisputed fact remains that Plaintiff did not possess all of the T4 requirements.   At summary judgment Plaintiff only has the declarations of co-workers who have stated that they believe Plaintiff was qualified for promotion during the relevant time period.   However, the declarations contain no facts to support the bald assertion about Plaintiff's qualifications, and even if they did, the evidence would otherwise fail to establish that Defendant had a discriminatory motive.[85]   Therefore, Defendant's Motion is **GRANTED** as to this claim.

## III. Retaliation

Defendant next seeks summary judgment on Plaintiff's claim for retaliation.   In order to make out his *prima facie* case of retaliation, Plaintiff must demonstrate the following: (1) that he

---

[84] *Nguyen v. City of Cleveland,* 229 F.3d 559, 562-63 (6th Cir. 2000).

[85] *Martinez v. Ltd. Brands, Inc.*, 200 F. App'x 571, 575 (6th Cir. 2006) (holding that co-workers' opinions that the plaintiff was qualified for a promotion were not "sufficient" to show pretext); *Browning v. Dep't of the Army,* 436 F.3d 692, 697 (6th Cir. 2006) ("[T]he employer's motivation, not the applicant's perceptions, or even an objective assessment of what qualifications are required for a particular position, is key to the discrimination inquiry."); *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1984) (finding affidavits of several co-workers "miss the point" as "[t]he law does not require employers to make perfect decisions, nor forbid decisions that others may disagree with … [and while the] affidavits reveal perhaps a reasonable difference in opinion, . . . their bald assertions and conclusory statements fail to provide any factual support for Hartsel's claim").

engaged in protected conduct; (2) that Defendant had knowledge of his protected activity; (3) that Defendant took an adverse employment action against him; and (4) that there was a causal connection between the protected activity and the adverse employment action.[86] For the reasons that follow, the Court holds that Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

With respect to the first element, the Court finds that genuine issues of material fact remain about whether Plaintiff engaged in protected activity. Plaintiff argues that he engaged in protected activity by first addressing a letter to human resources in which he complained about "discrimination" during the promotions process. The Sixth Circuit has held that "a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice."[87] Plaintiff's letter to human resources amounts to "a vague charge of discrimination" and does not constitute protected activity. Plaintiff simply claimed that an unidentified document allegedly showing Katrece Brown, Delois Kinnie, and Mike Stout "at the T4 level in the immediate future" was indicative of "discrimination."[88] The charge of "discrimination" is vague at best in light of the fact that Kinnie is, like Plaintiff, African-American. Without some specific opposition to discrimination on the basis of race, the Court concludes that this internal letter did not rise to the level of protected activity for purposes of Title VII. Nevertheless, Plaintiff has also adduced evidence that he made an oral complaint of racial discrimination in meetings with

---

[86] *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008).

[87] *Fox v. Eagle Distrib. Co., Inc.*, 510 F.3d 587, 591-92 (6th Cir. 2007) (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)).

[88] King Letter (D.E. # 44-10).

34

Kristen King and Frank Napadek, both in human resources. Oral complaints qualify as protected activity for purposes of a Title VII retaliation claim.[89] Accepting this evidence as true at summary judgment, Plaintiff can satisfy this element of his *prima facie* case.[90]

Although Plaintiff can show that he engaged in protected activity, the Court holds that Plaintiff has not shown that the relevant decision-makers knew about his complaints of race discrimination. The Sixth Circuit has held that "[t]he decisionmaker's knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation."[91] Plaintiff has alleged that the elimination of his extended role in the lab and transfer to the hot oil department more than one year later were adverse employment actions taken in retaliation for his complaints. However, Plaintiff has failed to show that the individuals who made these decisions knew about Plaintiff's protected activity. First, it is undisputed that Defendant utilized a group of employees to select which lab technicians would lose their extended roles and that Jeffrey Bruns and Stuart Massey were members of the decision-making group. Both Bruns and Massey claim that they had no knowledge of Plaintiff's complaints of racial discrimination at the time the PBDM group selected Plaintiff to rotate out of his extended role. For his part Plaintiff has not adduced any proof to contest their

---

[89] *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 288-89 (6th Cir. 2012).

[90] Plaintiff's brief also states that he participated in an investigation of discrimination charges filed by Reginald Charles and told an unidentified attorney for Defendant that Stuart Massey would not promote Charles because of racial bias. (Pl.'s Resp. in Opp'n 3.) While this participation also qualifies as protected activity, Plaintiff admitted during his deposition that he did not remember when he gave these statements. (Reed Dep. 300:4-6, Apr. 3, 2012.) What is more, Plaintiff admitted that he did not know whether Massey or Bruns or any other relevant decision-maker had knowledge of his statements during the internal investigation. (*Id.* at 299:11-300:3.)

[91] *Frazier v. USF Holland, Inc.,* 250 F. App'x 142, 148 (6th Cir. 2007).

claims or show that any other members of the group had knowledge of his protected activity. As such, Plaintiff has failed to show that genuine issues of material fact remain on this question. For the same reasons, Plaintiff cannot show that Defendant retaliated against him by reassigning him to "a much more strenuous position" in the hot oil department.[92] Plaintiff admits that he has no knowledge of who made that decision or how it was made. It follows that Plaintiff cannot prove that the decision-maker knew about his protected activity. Because Plaintiff cannot meet his burden on this essential element, Defendant's Motion is **GRANTED** on the retaliation claim.

## IV. Hostile Work Environment

Finally, Defendant seeks summary judgment on Plaintiff's claim for hostile work environment. As an initial matter, Defendant argues in a footnote that Plaintiff failed to exhaust his administrative remedies for the claim.[93] Although Plaintiff has failed to respond to Defendant's argument on this point, Plaintiff did attach his EEOC charge to his initial Complaint.[94] Nowhere in his charge did Plaintiff mention his claim of hostile work environment or allege any facts to support such a claim. Arguably Plaintiff has failed to exhaust his administrative remedies, making the claim ripe for dismissal.[95] On the other hand, Plaintiff did name Stuart Massey and refer to the alleged noose incident in an EEOC intake questionnaire.[96] The Sixth Circuit has held that an EEOC "charge

---

[92] Pl.'s Resp. in Opp'n 15.

[93] Def.'s Mem. in Support Mot. Summ. J. 13 n.3 (D.E.# 41-1).

[94] Compl., ex. EEOC Charge of Discrimination (D.E. # 2-2).

[95] 42 U.S.C. § 2000e–5(e), (f); *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 362 (6th Cir. 2010).

[96] *See* EEOC Intake Questionnaire 4 (D.E. # 70-2).

information form" is a "charge" for purposes of the exhaustion requirement.[97]  In *Williams*, the court

liberally construed a *pro se* plaintiff's EEOC form to refer to a claim of sexual harassment where the

form identified the alleged harasser, described the harassment, and indicated that the harassment was

a continuing action.[98]  Regardless of whether Plaintiff's intake questionnaire satisfied the exhaustion

requirement here, the Court finds it unnecessary to resolve the exhaustion issue.

Assuming that Plaintiff properly exhausted the claim, the Court holds that Plaintiff has failed

to make out his *prima facie* case for hostile work environment.  Title VII prohibits discrimination

that is "so severe or pervasive as to alter the conditions of [the victim's] employment and create an

abusive working environment."[99]  In order to establish a *prima facie* case of hostile work

environment based on race, a plaintiff must demonstrate the following elements: (1) that he is a

member of a protected class; (2) that he was subjected to harassment, either through words or

actions, based on his race; (3) that the harassment had the effect of unreasonably interfering with the

plaintiff's work performance and creating an objectively intimidating, hostile, or offensive work

environment; and (5) there exists some basis for liability on the part of the employer.[100]  The

Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms

and conditions of employment."[101]  Conduct that is "merely offensive" is insufficient to support a

---

[97] *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 509-510 (6th Cir. 2011).

[98] *Id.*

[99] *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

[100] *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009) (citation and quotation marks omitted)).

[101] *Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998).

hostile work environment claim.[102]

The Court must look at the totality of the circumstances to analyze whether the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.[103] Appropriate factors to consider include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[104] "Isolated incidents. . . , unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment."[105] Furthermore, only incidents that occurred because of a plaintiff's protected status are properly considered in the context of a claim of hostile work environment.[106]

The Court holds that Plaintiff has not shown under the totality of the circumstances that he was subjected to a hostile work environment. Plaintiff bases his claim on the same evidence already discussed in the Court's analysis of Plaintiff's other claims: the alleged noose incident, Massey's terse responses to communications from Plaintiff, the use of racial euphemisms in the workplace, co-workers' excluding Plaintiff from lunch breaks, management interacting with Plaintiff less, and a prank where another employee splashed liquid in Plaintiff's face. Even viewing the proof in the light most favorable to Plaintiff, the Court holds that none of this evidence had the effect of

---

[102] *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993).

[103] *Clay*, 501 F.3d at 707 (citation and quotation makes omitted).

[104] *Id.* (quoting *Harris,* 510 U.S. at 23).

[105] *Bowman v. Shawnee St. Univ.*, 220 F.3d 456, 463 (6th Cir. 2000).

[106] *Howard v. Bd. of Educ. of Memphis City Schs.*, 70 F. App'x 272, 282 (6th Cir. 2003).

unreasonably interfering with plaintiff's work performance and creating an objectively intimidating, hostile, or offensive work environment. With respect to the racial euphemism, the single occasion when a co-worker referred to "fried chicken" and "watermelon" can best be characterized as an isolated offensive utterance.[107] To the extent that the other treatment Plaintiff describes can be considered "harassment," Plaintiff has not shown that his co-workers and managers, including Stuart Massey, treated him differently because of his race, much less that they did so with any frequency.[108] Therefore, the Court concludes that this proof would not help Plaintiff's hostile work environment claim survive summary judgment.

Plaintiff is left to rely then on the alleged noose incident as proof of a hostile work environment. For the reasons already discussed, Plaintiff's claim that Massey displayed a noose is obviously a very serious one. The evidence on this point shows that Massey removed a telephone extension cord from a desk drawer, that moments later another technician asked Massey if he was going to hang someone with it, and that Plaintiff believed that Massey had made a noose "out of the cord or some type of gesture to indicate something that [Plaintiff] felt was extremely offensive."[109] Whether or not Massey ever fashioned a noose out of the telephone cord, a reasonable juror could at least find that Massey made some gesture behind Plaintiff's back, including perhaps some motion

---

[107] *Clay*, 501 F.3d at 706 ("[T]he incidents complained of amounted to 'mere offensive utterances,' which are not actionable under Title VII.") (citation omitted).

[108] The same must be said of Stuart Massey's single email to Plaintiff or his terse response to Plaintiff over the telephone. The incidents were sporadic and fail to show that Massey treated Plaintiff differently because of his race. *Weatherby v. Fed. Exp.*, 454 F. App'x 480, 492-93 (6th Cir. 2012) ("The infrequency of the uncomfortable or unwelcomed incidents experienced by Plaintiff . . . do not rise to the level required to sustain a hostile work environment claim at the summary judgment stage.").

[109] Reed Dep. 252:20-24.

to hang Plaintiff, and that such an act might suggest Massey's hostility to Plaintiff. The Court holds that these would be questions of fact to be determined by a jury.

Even giving Plaintiff the benefit of these reasonable inferences, the Court concludes that proof of this single incident is insufficient to establish Plaintiff's claim for hostile work environment. Plaintiff has only this single episode of racial harassment from the fourteen and one-half years between the date Defendant hired him and the date he filed suit, and even at that Plaintiff admitted that he could not remember when it occurred.[110] The Supreme Court has remarked that a hostile work environment claim "cannot be said to occur on any particular day."[111] Under the totality of the circumstances, Plaintiff has not adduced proof to show that a reasonable person could find the work environment to be objectively hostile.[112]

Finally, Plaintiff has again cited the declaration of Reginald Charles, describing other incidents where unidentified employees and managers used racial epithets and discriminated against African-American employees. The Court has already noted the defects in the Charles declaration and declined to analyze it at summary judgment. Even if Charles had provided more detailed information about the other acts of discrimination in the workplace, the declaration standing alone fails to support Plaintiff's hostile work environment claim. There is no evidence that Plaintiff knew

---

[110] *Weatherby*, 454 F. App'x at 492-93.

[111] *Clay*, 501 F.3d at 708 (quoting *Ledbetter v. Goodyear Tire & Rubber Co.,* 550 U.S. 618, 638 (2007) (superseded by statute on other grounds) and *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115-16 (2002)).

[112] *Cregget v. Jefferson Cnty. Bd. of Educ.*, No. 11-6375, 2012 WL 3104508, at *8 (6th Cir. Aug. 1, 2012) (holding that an employee had not established racially hostile work environment claim where the plaintiff could only show that he felt "shunned" by his school principal).

about the events to which Charles alludes.  It is well-settled that "comments or conduct of which a plaintiff had no knowledge cannot be said to have made h[is] work environment hostile."[113]  Without some proof that Plaintiff himself was aware of the events Charles mentions, the evidence does not support Plaintiff's harassment theory.  Therefore, Defendant's Motion is **GRANTED** on Plaintiff's claim of racially hostile work environment.

## V. Mixed Motive Analysis

As a final issue, Plaintiff argues in his response brief that the Court should analyze his race discrimination claims for failure to train and failure to promote under the Sixth Circuit's mixed motive test.  "Allegations of discriminatory conduct . . . fall into one of two categories: single-motive claims, where an illegitimate reason motivated an employment decision, or mixed-motive claims, where both legitimate and illegitimate reasons motivated the employer's decision.[114]  In order to survive summary judgment on a discrimination claim under a mixed-motive analysis, Plaintiff must "produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) race, color, religion, sex, or national origin was *a* motivating factor for the defendant's adverse employment action."[115]  Plaintiff's brief recites this test for mixed motive claims and then argues without elaboration that the same evidence supporting his other claims also shows that his race was a motivating factor in Defendant's denial of training and the

---

[113] *Armstrong v. Whirlpool Corp.*, 363 F. App'x 317, 328 (6th Cir. 2010) (quoting *Barrett v. Whirpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009)).

[114] *Spees*, 617 F.3d at 389-90 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008) (internal quotation marks omitted)).

[115] *Griffin*, 689 F.3d at 595 (quoting *White v. Baxter Healthcare*, 533 F.3d at 400) (emphasis in original).

denial of his promotion to T4. In its reply brief Defendant responds that without direct evidence of discrimination, Plaintiff cannot establish his mixed motive claims. Defendant has not cited any authority for this proposition, and the Sixth Circuit has consistently held that a plaintiff "can pursue mixed-motive Title VII claims based solely on circumstantial evidence."[116]

The Court finds that neither party has fully argued the relevant Sixth Circuit law on mixed motive claims or applied that authority to the facts in the record at summary judgment. Even so, the Court holds that Plaintiff cannot prove his failure to train theory under a mixed motive analysis. The Court has already held as a matter of law that Defendant's delay in providing Plaintiff coaching or a pre-gap assessment for promotion to T4 did not constitute an adverse employment action. For the same reason then that the Court granted Defendant summary judgment on Plaintiff's single motive claim, the Court concludes that Defendant is entitled to judgment as a matter of law on Plaintiff's mixed motive claim for the same failure to provide training. Plaintiff has failed to show that the failure to train was an adverse employment action. Therefore, Defendant's Motion for Summary Judgment is **GRANTED** as to this claim even without the benefit of full briefing on the question.

As for Plaintiff's failure to promote claim, more complete briefing from the parties would assist the Court in reaching the merits of the issue. Therefore, the parties are ordered to prepare supplemental briefing on Plaintiff's mixed motive failure to promote theory to include citations to appropriate case law, application of that authority to the facts in the record at summary judgment, and the possible remedies to which Plaintiff would be entitled, if the matter went to a jury and the jury returned a verdict in favor of Plaintiff. Because Defendant is the party seeking summary

---

[116] *Griffin*, 689 F.3d at 595 ("The evidence of discrimination [in a mixed motive case] can be direct or circumstantial."); *see also Williams v. Zurz*, No. 10-4161, 2012 WL 5351270 (6th Cir. Oct. 30, 2012) (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100–101 (2003)).

judgment, Defendant is directed to file its supplemental brief within twenty-one (21) days of the entry of this Order. Plaintiff must then respond to Defendant's supplemental brief within twenty-one (21) days of service of the brief. Once the parties have completed briefing on the issue, the Court will take the matter up in a subsequent order.

**<u>CONCLUSION</u>**

Defendant's Motion for Summary Judgment is **GRANTED** as to Plaintiff's single motive claim of race discrimination, retaliation, and hostile work environment. Likewise, Defendant's Motion is **GRANTED** as to Plaintiff's mixed motive failure to train claim. The parties are ordered to prepare supplemental briefs on Plaintiff's remaining claim for failure to promote under a mixed motive analysis.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: February 27, 2013.